UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————x

JAVON SEGREDE,

Plaintiff,

No. 21-CV-2255 (CM)

-against-

THE CITY OF NEW YORK AND OFFICER
SAEED BERNARD,

Defendants.

———————————————————————x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 5/28/2024

## MEMORANDUM ORDER AND DECISION GRANTING CITY DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

McMahon, J.:

This is a civil rights action. Plaintiff Javon Segrede was held prior to his trial on unknown charges at the Anna M. Kroos Center ("AMKC") and the Vernon C. Bain Center ("VCBC") on Rikers Island. Segrede, represented by Alan Levine, claims that he was potentially vulnerable because of his sexual orientation and alleges that the Department of Correction ("DOC") failed to comply with its own procedures regarding the placement of potentially vulnerable inmates into protective custody. As a result, Segrede was sexually assaulted by an unidentified male inmate on three separate occasions in March 2018 at VCBC. Segrede also alleges that, while incarcerated at VCBC, Defendant Officer Saeed Bernard groped his buttocks and threatened to harm Segrede if he told anyone.

Segrede's complaint contains two claims: a claim against the City under *Monell v. Department of Soc. Svcs.*, 436 U.S. 658 (1978), for a pattern and practice of failing to follow its

own protective custody procedures (Count I); and a claim against Officer Bernard for violation of due process under 42 U.S.C. § 1983 (Count II).

The period allowed for discovery having expired, the City, through Corporation Counsel, moves for summary judgment on **Count I** on the ground that Segrede fails to satisfy the standard set forth in *Monell*. Corporation Counsel also represents Officer Bernard but he made no summary judgment motion.

For the following reasons, the motion is granted.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

While the court generally uses the parties' Rule 56.1 statements to ascertain which facts are undisputed and which are not, I cannot do that in this case. The City's Rule 56.1 statement (Dkt. No. 60 ("SOF")) is woefully incomplete; it omits relevant and material facts and ignores aspects of the case. But Segrede's counterstatement is even worse: it adds just one material fact to those listed in the City's Rule 56.1 statement and fails to contest any of the City's statements of material fact. (*See* Dkt No. 72). As a result, the court has had to dig through the evidentiary record – principally Segrede's deposition testimony (Dkt. No. 61-4 ("ST")) – to figure out what happened in this case and what facts are arguably relevant. Much of what Segrede testified to is not rebutted by any other evidence. However, his attorney took absolutely no discovery in this case, which is the principal reason why Segrede is unable to respond adequately to the City's motion.

### Segrede's Arrival at AMKC

Segrede entered DOC custody at AMKC on February 17, 2018, following his arrest for an unknown crime. (SOF ¶19). Upon arrival to AMKC, Segrede reported to DOC employees that he did not identify as gay and that he did not have concerns for his safety while incarcerated. (SOF

¶20; Dkt. No. 61-6). This was not true: Segrede is a gay male, and as a result he was fearful of beatings, rapes, and harassment by the inmates of the general AMKC population. (ST at 149:2-9).

Segrede had been arrested on previous occasions; on each such occasion he was placed in protective custody because he requested it. (SOF ¶14; ST at 149:13–150:22). For unexplained reasons, Segrede assumed that he would automatically be placed in protective custody upon intake after his February 2018 arrest. (SOF ¶23). However, Segrede did not request such placement upon intake; he admittedly hid his sexual orientation from DOCS officials upon his arrival at Rikers. (*See* Dkt. No. 61-6).

## Segrede's Initial Placement in Protective Custody

On March 1, after spending two weeks in AMKC's general population unit, Segrede requested placement in protective custody by filing an "Inmate Voluntary Statement" form. (SOF ¶24; Def. Ex. G). In his request, Segrede wrote:

> I've filled 2 of these out already. One at intake and one on the 20th of Feb. in my housing unit. This will be the third statement. I need to be moved to protective custody because I am being threaten[ed] by inmates and food isn't being given to me. They tell me to get out of the house every day. I didn't think I would be here long. It's looking like I will go home my next court date. But who knows. Please help me. I am scared everyday that I walk out [of] my cell that I am going to be attacked and I'm scared for my safety.

*Id.*

Segrede submitted this statement to DOC Captain Moreno, who passed along the request to DOC Captain Jasmine Jonas. Captain Jonas interviewed Segrede and recommended that Segrede be placed in protective custody. (SOF ¶¶24-25; Def. Ex. C). Captain Jonas wrote in her report that:

> Inmate Segrede was interviewed by this writer and he verbally stated that he feels uncomfortable because the inmates found out that he is gay. He fears for his life in general population. He is being threaten[ed] and fears that once he walk[s] out of his cell they will attack him. Based on statement and interview, I recommend protective custody for the safety of the individual and the safety and security of the

3

facility.

(Def. Ex. H).

Captain Jonas emailed her report and recommendation up through the DOC chain of command for approval. A DOC employee, Simon Najah, responded to Captain Jonas's report:

Please be advise[d], the placement is vaguely written. According to the Nunez committee, a FFS solely on the inmate's word is insufficient for placement into Protective Custody. Obtain an incident report from staff whom may have witnessed tension between the subject and other inmates in the unit. Placements with no investigation and solely indicating a FFS based on the inmates word will be denied. If a more thorough investigation is forwarded the placement will be considered. Consider swapping the inmate in the morning.

(Def. Ex. J).

Captain Jones responded: "In the investigation he mentions his sexuality. If we swap him somewhere else it is going to be the same issue. That is why he is fearing for his safety because he is gay." *Id*. Fourteen minutes later, DOC employee Mark Wynter approved the request and the DOC moved Segrede into protective custody at AMKC. (*Id*.; SOF ¶27).

### Segrede's Removal from Protective Custody

On March 8, 2018, while in protective custody, Segrede was involved in a physical altercation with another inmate. (ST at 200:11-201:6). The City maintains that Segrede started the fight and assaulted the other inmate, while Segrede insists that he was defending himself against the other inmate "who was displaying a sharp object" and threatening him. (Dkt. No. 72). Although the parties both cite to separate portions of Segrede's deposition transcript in support of their positions, neither party submitted the relevant portions of the transcript as part of the evidentiary record before this court.

The DOC's Use of Force ("UOF") report from the incident recounts that:

AT 0514 HOURS, IN HOUSING AREA QU15 (ADULT IPC), INMATES SEGREDE (NSRG,CL 9) AND AMADOR (LATIN KING,CL 15) WERE INVOLVED IN A FIGHT. OFFICER ALBA (DOA 06119117) ORDERED THE

4

INMATES TO STOP FIGHTING AND WARNED CHEMICAL AGENT (OC) WILL BE UTILIZED. THE INMATES REFUSED TO COMPLY. OFFICER ALBA DEPLOYED ONE APPLICATION OF CHEMICAL AGENT (OC) AT THE INMATES TERMINATING THE INCIDENT. NO INJURIES WERE REPORTED FOR STAFF OR INMATES. THIS INCIDENT IS CLASSIFIED AS A "C" USE OF FORCE. VIDEO SURVEILLANCE: YES/CHEMICAL AGENT (OC) UTILIZED: YES.

(Def. Ex. J).

On March 9, 2018, Segrede was transferred from protective custody back into general population housing. (SOF ¶29). The DOC's transfer order states that "On [March] 8, 2018, while incarcerated in AMKC's PC unit, Inmate Segre and Inmate Amador . . . were involved in a fight. DOC Staff gave several direct orders to stop fighting or chemical agents would be utilized. Inmates refused to comply, resulting in a UOF with DOC staff. Based on his actions, inmate Segrede shall be transferred to general population." *Id.*

### Segrede's First Sexual Assault at VCBC

On March 15, 2018, Segrede was transferred from AMKC to VCBC, another DOC facility. (SOF ¶30). The record does not reveal the reason why Segrede was moved; it would be conjecture to conclude that it was an outgrowth of his fight with Amador, though that seems a logical reason.

At intake, Segrede asked an unidentified DOC officer for a protective custody request form. The DOC officer denied Segrede's request, saying, "We're not doing that today." (Pl. Ex. B at 323:1-21). Segrede later asked the same DOC officer if he could speak to a DOC captain. *Id.* This request was also denied. As a result, Segrede was placed in general population housing. *Id.*

That same day, Segrede went to take a shower. (ST at 241:2-6). While in the shower, another inmate approached Segrede and demanded oral sex. *Id.* at 240:3-10. Segrede felt threatened by the other inmate and feared that the inmate would hurt him, so Segrede provided the inmate with oral sex. *Id.* at 240:14-20. Afterwards, the inmate told Segrede, "don't say anything to anybody . . . . You know what will happen to you if you say something." *Id.* at 248:14-19. Segrede

5

told the inmate "okay" because Segrede "knew better than to say anything." *Id.*

## Segrede's Disciplinary Hearing

On March 19, 2018, DOC officials held a disciplinary hearing arising out of the fight between Segrede and Amador. (Def. Ex. P). Segrede was charged with "fighting" and "refusal to obey direct orders." (*Id.* at DX 000099-100). Segrede pled not guilty to both charges and testified that "[Inmate Amador] threatened to hurt me and then he threw something at me so I got up and that's when we fought. I thought one of us will have to leave if we fight. He was saying stuff to us because we were gay." (*Id.* at DX 000098).

In addition to Segrede's testimony, the adjudicating DOC captain reviewed (1) the incident report of DOC Officer Alba, who witnessed the fight; (2) the incident investigation report of DOC Captain Marshall, who reviewed staff reports and medical documentation of the incident; and (3) security camera footage of the fight. (*Id.* at DX 000099-100). Based on the evidence before him, the adjudicating official found Segrede guilty of the two charges of "fighting" and "refusal to obey direct orders," and sentenced Segrede to 24 days of punitive segregation. (*Id.* at DX 000099-100).

## Segrede's Second and Third Sexual Assaults

On March 26, 2018, Segrede was in the VCBC showers when an inmate - the same one who had previously assaulted Segrede – approached him. (SOF ¶34). The inmate forced Segrede to have anal sex with him. (ST at 244:3- 245:2).

On March 29, 2018, the same inmate approached Segrede in the showers late at night. *Id.* at 245:20-22. The inmate again tried to force Segrede to have sex with him. *Id.* at 246:1-16. Segrede physically resisted the inmate and told the inmate that he would not do so. *Id.* Due to the noise of Segrede's resistance, the inmate relented and "just went away" so as not to alert DOC guards. *Id.*

6

After this third incident, Segrede gathered his belongings and tried to leave the general population housing area. (SOF ¶36; ST at 245:2-9). While at the exit doors, Segrede informed DOC officers "I fear for my life, and you have to let me out." (ST at 255:1-2). DOC officers allowed Segrede to leave the area and placed him back in intake. (SOF ¶37; ST at 255:13-16).

Early the next morning, on March 30, 2018, Segrede submitted a statement with DOC officers saying that:

> I was being extorted for my belongings and they took my radio. I was woke [sic] up to an inmate with a knife in his hand telling me to pack up. All the inmates in the housing unit made the young boy do it because he was gullable [sic] enough to do it. I was sexually assaulted in the bathroom tonight and I believe this happened because I didn't want to perform sexual acts. I live my life as a female outside of jail and because I'm not in a gang and my sexual preference I am a target every house that I go to. This happened before and I ended up in a fight and fined for it. I am scared to stay in a dorm. I can't sleep at night because I fear for my life. I've been called all kind of degrading names, bullied, assaulted, and I'm scared to speak up because when I do nothing is done about it. I'm speaking up now. What will/can be done now? I don't want to stay on this boat.

(Def. Ex. Q). In response to Segrede's statement, the DOC issued Segrede a Notice of Hearing Protective Custody Housing Form and DOC Captain Mayra Burgos recommended placing Segrede in protective custody. (SOF ¶¶42-43). The DOC also transported Segrede to Bellevue Hospital, where he was provided with medical treatment and mental health counseling services for the assaults. (SOF ¶¶39-40).

On April 2, 2018, the DOC approved Captain Burgos' request and determined that Segrede was to be housed in protective custody at the Brooklyn Detention Center ("BKDC"). (SOF ¶45).

On April 3, 2018, after he returned from Bellevue Hospital, Segrede was placed in protective custody at BKDC. (SOF ¶44).

### Segrede's Placement in Punitive Segregation at GRVC

On April 20, 2018, Segrede was transferred to punitive segregation (i.e., "the box") at the George R. Vierno Center (GRVC) as punishment for the March 8, 2018, physical altercation at

AMKC. (SOF ¶48). Segrede spent 21 days in "the box". (SOF ¶¶49-50).

On April 23, 2018, while in "the box," Segrede reported to DOC employees that he did not have concerns for his safety. (SOF ¶20)

On May 11, 2018, Segrede was released from punitive segregation at GRVC and transferred back to protective custody at BKDC. (SOF ¶51).

Segrede was released from this incarceration on an unknown date.

### Segrede's Subsequent Incarceration

In September 2021, Segrede was again incarcerated at AMKC after being arrested on an unknown charge. During this incarceration, the DOC placed Segrede in protective custody. (SOF ¶52).

### Segrede Files Suit

Segrede, represented at all times by counsel, filed this lawsuit on March 15, 2021. (Dkt. No. 1). On May 19, 2021, Segrede, with leave of the court, filed an amended complaint. (Dkt. No. 12).

On August 5, 2021, the City moved to dismiss the complaint. (Dkt. No. 21). Segrede opposed the motion and cross moved for leave to file a second amended complaint. (Dkt. Nos. 30-32). The City consented to Segrede's amendment but reserved its right to renew its motion to dismiss. (Dkt. No. 33). The court subsequently granted Segrede's second request to amend, (Dkt. No. 34), and on September 21, 2021, Segrede filed a second amended complaint, which is the operative complaint for purposes of this motion. (Dkt. No. 35) ("Compl.").[1]

Since then, this court has had to repeatedly prod the parties to move this case along. (Dkt.

---

[1] Segrede's counsel attaches the *first* amended complaint to his opposition papers and cites to it as though it is the operative complaint. (Dkt. No. 71-1). The court assumes this was a mistake on counsel's part, but for the sake of clarity, the operative complaint is the *second* amended complaint.

Nos. 43, 51). It was not until February 12, 2023 – nearly two years after the initial complaint was filed – that the parties finally submitted a discovery plan to the court. (Dkt. No. 47). As previously noted, Segrede's counsel noticed no discovery, including no *Monell* discovery about policies and practices at Rikers concerning the placement of individuals in protective custody for their safety. Defendants took Segrede's deposition and produced the DOC records relevant to Segrede's 2018 incarceration.

On December 1, 2023, the City moved for summary judgment dismissing Segrede's § 1983 claims against the City. (Dkt. No. 58), which Segrede has opposed. (Dkt. No. 70).

## STANDARD

### A. Summary Judgment

Summary judgment must be granted when there is "no genuine dispute as to any material fact and the movant[s] [are] entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. At summary judgment, the movants bear the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Feingold v. New York*, 366 F.3d 138, 148 (2d Cir. 2004).

Once the movants meet that burden, the non-movants may defeat summary judgment only by producing evidence of specific facts that raise a genuine issue for trial. *See* Fed. R. Civ. P. 56(c); *Anderson*, 477 U.S. at 248; *Davis v. New York*, 316 F.3d 93, 100 (2d Cir. 2002). To survive summary judgment, the non-movants must present concrete evidence and rely on more than conclusory or speculative claims. *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir. 1980). In assessing the record to determine whether genuine issues of material fact

9

are in dispute, a court must resolve all ambiguities and draw all reasonable factual inferences in favor of the non-moving party. *See Parkinson v. Cozzolino,* 238 F.3d 145, 150 (2d Cir. 2001).

## DISCUSSION

Segrede alleges a violation of his rights under *Monell v. Department of Soc. Svcs.,* 436 U.S. 658 (1978). "*Monell* does not provide a separate cause of action . . . it *extends* liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation." *Segal v. City of New York,* 459 F.3d 207, 219 (2d Cir. 2006) (emphasis in original). Since "*Monell* expressly prohibits *respondeat superior* liability for municipalities . . . a plaintiff must demonstrate that 'through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged.'" *Agosto v. N.Y.C. Dep't of Educ.,* 982 F.3d 86, 98 (2d Cir. 2020) (emphasis in original) (*quoting Bd. of Cty. Comm'rs of Bryan Cty., Okla v. Brown,* 520 U.S. 397, 404 (1997)).

### A. Segrede's § 1983 Protective Custody Claim Is the Only § 1983 Claim the Court Will Consider

In his Second Amended Complaint, Segrede alleges that the DOC had a custom and practice of failing to follow its own procedures when an inmate sought placement into protective custody. According to Segrede, the DOC thereby endangered him and other inmates who require protective custody as a result of their sexual orientation. (Compl. ¶¶27-28). Discovery, to the extent that it was taken, proceeded on this theory.

However, in his opposition to summary judgment, Segrede abandons this theory and instead asserts that the DOC had a custom and practice of failing to comply with the federal Prison Rape Elimination Act ("PREA"). According to Segrede, the DOC's failure to comply with the PREA enabled a Rikers inmate to assault Segrede, as there was no correction officer present to intervene on the Segrede's behalf during the sexual assaults. This of course has nothing to do with

whether plaintiff was placed in protective custody – which was the gravamen of the violation alleged in his pleading and discussed at his deposition.

Segrede's second § 1983 argument is improperly raised and the court cannot and will not consider it. Courts will "not consider an argument raised for the first time in Plaintiff's opposition to Defendants' motion for summary judgment." *Mediavilla v. City of New York*, 259 F. Supp. 3d 82, 108 (S.D.N.Y. 2016) (*citing Avillan v. Donahoe*, 483 F. App'x 637, 639 (2d Cir. 2012); *accord Shah v. Helen Hayes Hosp.*, 252 F. App'x 364, 366 (2d Cir. 2007)). "[A] party may not use opposition to a dispositive motion as a means to amend the complaint." *Avillan*, 483 F. App'x at 639 (*citing Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir.1998)). Application of this usual rule is particularly appropriate in this case, since Segrede was twice granted leave to amend his complaint. In neither amended pleading did his *Monell* claim rest on any failure by the DOC to station corrections officers in showers and other locations where their presence could deter inmate on inmate sexual assault.

Plaintiff is master of his complaint. We will proceed on the allegations that were made in the second amended complaint – which means the *Monell* claim against the City rests on an alleged failure to comply with policies and procedures to safeguard vulnerable inmates by placing them in protective custody. That is the only *Monell* claim raised in Segrede's complaint and it is the *Monell* claim against which the City has moved for summary judgment. Ergo, it is the only *Monell* claim that the court will consider. The fact that Segrede's last second effort to change his theory of liability particularly is an obvious attempt to get around his inability to dispute any of the City's arguments for dismissing the *Monell* claim that he actually pleaded and does not render his strategy acceptable.

**B. It is Undisputed That Segrede's Constitutional Right to Protection from Assault was Violated by An Unnamed Corrections Officer's Failure to Follow City Policy**

To state a claim for municipal liability under *Monell*, a plaintiff must allege: "(1) a municipal policy or custom that (2) causes the plaintiff to be subjected to (3) the deprivation of a constitutional right." *Agosto*, 982 F.3d at 97. "To establish a municipal policy or custom, the plaintiff may allege either (1) a formal policy, promulgated or adopted by the entity; or, (2) that an official with policymaking authority took action or made a specific decision which caused the alleged violation of constitutional rights; **or** (3) the existence of an unlawful practice by subordinate officials that was so permanent or well settled so as to constitute a 'custom or usage,' and that the practice was so widespread as to imply the constructive acquiescence of policymaking officials." *Bektic-Marrero v. Goldberg*, 850 F. Supp. 2d 418, 430 (S.D.N.Y. 2012) (emphasis added) (*citing Jouthe v. City of New York*, 2009 WL 701110, at *7 (E.D.N.Y. March 10, 2009)).

"[P]rison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994). "This includes inmate-on-inmate sexual assault." *Villar v. Cnty. of Erie*, No. 13-CV-467S, 2020 WL 33125, at *3 (W.D.N.Y. Jan. 2, 2020). "Prison conditions may be restrictive and even harsh, but gratuitously allowing the beating or rape of one prisoner by another serves no legitimate penological objectiv[e] . . . . Being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society." *Farmer*, 511 U.S. at 833 (internal citations and quotation marks omitted). "[F]ailure to protect an inmate from a risk of assault can therefore be a violation of that inmate's constitutional rights under the Eighth and Fourteenth Amendments." *Villar*, 2020 WL 33125, at *3 (collecting cases).

It is undisputed that DOC had a formal policy pursuant to which an inmate could make a request for placement in protective custody. The evidence certainly supports the existence of such

12

a policy: it is DOC Directive 6007R-A, effective August 27, 2010, which contains the City's formally adopted policy on how to address requests for placement in protective custody. (Dkt. No. 61-2). The directive states that, "The Department *shall afford inmates opportunity to request assignment to protective custody housing* and will evaluate whether assignment (voluntary assignment to protective custody) is appropriate." *Id.* at 1 (emphasis added). The DOC directive further states that "*Any staff member who receives information indicating that an inmate may require protective custody, including a request from an inmate for protection, must immediately notify the area captain, and keep the inmate separate and apart from other inmates until the captain arrives.* The staff member must complete Section A, Form 6007A." *Id.* at 4 (emphasis added).

This policy requires DOC to allow inmates to file such requests and sets forth procedures for acting on those requests – as well as procedures to be followed while requests are pending, such as separation of the requesting inmate from other inmates until a decision can be made. It does not include any provision that would allow a corrections officer to refuse to allow an inmate to make such a request. To the contrary: if an inmate wants to make such a request DOC "shall allow" him do to so.

The existence of this policy is confirmed by statements contained in the Inmate Handbook, which is given to every inmate upon intake. To his Second Amended Complaint, Segrede attaches a copy of DOC's "Inmate Handbook," which contains the following information "If you or the Department thinks you may need housing in . . . protective custody, you will be transferred to [protective custody] housing while the Department evaluates your housing needs. A decision will be made within 2 business days as to the type of housing that is best-for you." (Dkt. No. 35 at 10).

Insofar as is relevant, it is also undisputed that Segrede was not allowed to make the

necessary written request for placement in protective custody on March 15, when he was moved from AMKC to VCBC, a different facility at Rikers. While Segrede was at intake at VCBC, Segrede asked for a protective custody form, but an unnamed DOC officer told him, "We're not doing that today." *Id.* Segrede then later asked the same DOC officer if he could speak to a captain; this request, too, was denied. (Pl. Ex. B at 323:1-21).

These admitted facts – acknowledged in the City's own Rule 56.1 counterstatement as "Not disputed" – unquestionably establish a failure to follow the alleged DOC policy, in that Segrede indicated that he wanted to request protective custody but was not given the "opportunity to request assignment to protective custody housing," by filling out a Voluntary Inmate Statement and submitting it to a DOC captain. Failure to allow an inmate to request protective custody is just as much a violation of City policy as is failure to follow procedure once such a formal request is made.

Finally, the evidence establishes – or at least raises a genuine issue of fact – that Segrede was sexually assaulted by another inmate on two occasions while at VCBC, including on the day of his arrival, when he would and should have been isolated pending evaluation of the request for protective custody that he was not allowed to make. Segrede testified that, while housed in general population at VCBC, he was twice subjected to sexual assaults and once subjected to an attempted sexual assault. (ST at 240:14- 248:19). All of these assaults were perpetrated by another VCBC inmate while Segrede was in VCBC's general population shower areas. *Id.*

In addition to describing the three sexual assaults in detail (ST at 240:14- 248:19), it is undisputed that Segrede reported the third assault to DOC officers a few days after it occurred (SOF ¶38); that the DOC transferred Segrede to Bellevue hospital for treatment for his sexual assaults (*id.*); and that the DOC placed Segrede in protective custody at BKDC based on his

credible reports of a prior sexual assault. (SOF ¶41; Def. Exs. S, Q, R). The City includes every one of these things in its Rule 56.1 Statement of Undisputed Material Facts, which is certainly enough to, at a minimum, raise a genuine issue of fact that the assaults occurred.

However, the City claims that all this evidence should be disregarded because Segrede answered "no" to the question, "Have you ever had sexual contact with another inmate while at Rikers Island?" (ST at 139:19-21). Segrede admits the same in his 56.1 statement. (Dkt. No. 72 at ¶ 13).

It is indeed possible that Segrede's answer creates an inconsistency – one that might undermine the force of his testimony in the mind of a trier of fact, and so prevents this court, at this time, from concluding that the evidence in support of Segrede's claim, while overwhelming, is undisputed. But the purported inconsistency within Segrede's testimony does not negate the fact that the rest of the evidence is more than sufficient to create a genuine issue of fact for resolution by a trier of fact. Indeed, the "inconsistency" identified by the City is one for which Segrede may have a perfectly understandable explanation; the way the question is phrased, Segrede may well have understood the questioner to be asking about whether he had any consensual sexual encounters, not unwelcome assaults. All of that could be determined on cross.

Of course, the situation at VCBC is not the only one alleged in the complaint. The record reveals that Segrede made at least two requests – one on March 1, 2018 and another on March 30, 2018 – for placement in protective custody. These requests were, however, granted. So Segrede can hardly rely on them as evidence that his constitutional rights were violated by the City's failure to abide by its policy.

The record also reveals that, in his March 1, 2018 request, Segrede insisted that he had made similar requests at intake on February 17 and again from his housing unit on February 20,

which requests were ignored. Specifically, he wrote on March 1 that, "*I've filled 2 of these out already*. One at intake and one on the 20th of Feb. in my housing unit. This will be the third statement. I need to be moved to protective custody because I am being threaten[ed] by inmates . . . ." (Def. Ex. G) (emphasis added).

Segrede's unsworn assertion that he self-identified as a vulnerable inmate and asked for protective custody at intake is contradicted by his sworn deposition testimony, in which he admitted that he had not specifically asked for placement in protective custody upon intake but simply assumed that he would receive such a placement. Specifically, Segrede testified that "I was under the impression – obviously, it's not true because it did not happen – but I was under the impression that when you're in protective custody, leaving Rikers Island, when you return, for any other matter, any other matter, non-related, you get put back into protective custody." (ST at 149:18-23). Segrede did not testify as to why he was under this impression. It is also contradicted by the intake form, filled out by Officer Perkins, which indicates that Segrede was asked whether he feared for his safety for any reason but said that he did not. (Dkt. No. 61-6). There is, therefore, no competent evidence that Segrede sought placement in protective custody on February 17, and so no evidence to support a claim that the City either failed to follow proper procedures upon receiving a request for such placement or failed to allow Segrede to avail himself of those procedures.

Segrede's unsworn statement that he filled out a request for placement in protective custody on February 20 is problematic in that no such written request can be found and it is not supported by any sworn testimony or evidence whatsoever. It is, therefore, sheer speculation that Segrede actually filed an Inmate Voluntary Statement with anyone at DOC, let alone what happened to that Statement.

16

Finally, it is undisputed that, on February 17 (Segrede's arrival at AMKC), March 6, and April 23, 2018, DOC officials had Segrede fill out a PREA questionnaire to ascertain if Segrede was "at risk of victimization" and in need of protective custody. (Dkt. No. 61-6). The questionnaire asked Segrede "Do you consider yourself to be lesbian, gay, bisexual, transgender, intersex, or gender non-conforming?"; and "Do you have any concerns for your safety while you are here?" *Id.* On all three questionnaires, Segrede answered "No" to both questions. *Id.* The form also required DOC official to make their own inquiries as to whether Segrede needed protective custody, asking "Is the inmate small in stature?"; and "Does the inmate appear lesbian, gay, bisexual, transgender, or gender non-conforming?". On all three questionnaires, the preparing official answered "No" to both these questions. *Id.* Segrede's repeated failure to self-identify as a person in need of protection seriously undercuts any suggestion that he filed Voluntary Inmate Statements "outing" himself in the earliest days of his February 2018 incarceration.

But assuming arguendo that Segrede did indeed file requests for placement in protective housing prior to March 1, which request(s) was/were ignored, he was not assaulted prior to that date, or subjected to anything more than some threats based on his perceive sexual orientation. And it is beyond cavil that his March 1 request was handled in accordance with policy and was granted. So any failure to process requests that Segrede may previously have made did not result in actionable damage.

Which means that, in the end, this case is about what happened to Segrede at VCBC, where Segrede has established that he was deprived of a constitutional right by virtue of an unnamed corrections officer's violation of a formally adopted City policy. Had Segrede sued that officer (or named him as a John Doe and then added his name to the caption once he was identified), it is highly likely that I would be granting a motion for summary judgment in Segrede's favor against

17

that individual.

But the only defendant Segrede sued over the violation of the protective custody policy is the City. And that, sadly, is where his claim runs into insuperable obstacle.

## C. Segrede Offers No Evidence of Anything Other Than a Single Incident of Illegality, so His *Monell* Claim Against the City Fails.

The City of New York is not liable in *respondeat superior* for the discrete illegal acts of its officers under federal law. *See Jones v. Town of E. Haven*, 691 F.3d 72, 80 (2d Cir.2012). Instead, to survive a motion for summary judgment made by the City pursuant to *Monell*, Segrede must offer at least some evidence that the unnamed officer who violated City policy did so pursuant "an unlawful practice by subordinate officials that was so permanent or well settled so as to constitute a 'custom or usage,' and that the practice was so widespread as to imply the constructive acquiescence of policymaking officials." *Bektic-Marrero*, 850 F. Supp. 2d at 430. "The custom or usage of constitutional violations must be so pervasive that the need for corrective action can fairly be considered 'obvious,' such that the supervising policymaker's failure to take such action gives rise to an inference of his deliberate indifference to inmates' constitutional rights." *Id.* at 430-31. "Policy cannot 'ordinarily be inferred from a single incident of illegality,' and even multiple incidents, without more, do not create custom." *Deferio v. City of Syracuse*, 770 F. App'x 587, 591 (2d Cir. 2019) (*quoting Turpin v. Mailet*, 619 F.2d 196, 199 (2d Cir. 1980)).

On the record before me, there is no evidence whatever that the DOC had a "widespread" and "well settled" policy of ignoring or preventing inmate's protective custody requests. In fact, even just limiting ourselves to consideration of what happened to Segrede, the record demonstrates that the DOC regularly entertained and granted these requests: (1) On March 1 and March 30, 2018, Segrede's requests for protective custody were submitted, evaluated, and granted pursuant to DOC policy (SOF ¶24, Def. Ex. Q); (2) Segrede requested and was placed in protective custody

during several prior and subsequent incarcerations, and Segrede admitted that the DOC "accommodated" all those requests (SOF ¶¶23, 24, 52); (3) Segrede admitted that multiple DOC Officers worked to ensure approval of his protective custody paperwork and removed him from situations where he was being harassed in order to place him in protective custody (ST at 185:1-24); and (4) DOC officials immediately placed Segrede upon learning the he had been sexually assaulted. (SOF ¶¶42-43, 45). It seems, based on the evidence, that what happened to him at VCBC was a one-off instance of ignoring policy, rather than evidence of some custom of doing so.

Additionally, Segrede has not adduced any evidence that this alleged "custom and practice" has happened to "anyone else, which further undercuts [Segrede's] contention that [the DOC] had a custom or practice of infringing on constitutional rights." *See Deferio* 770 F. App'x at 591.

Thus, Plaintiff's § 1983 claim fails against the City.

## CONCLUSION

For the reasons discussed above, the City's motion for summary judgment as to Claim I is granted. The City is dismissed as a defendant from the case.

There remains a single claim against CO Bernard, who allegedly touched the plaintiff's buttocks – an assault in violation of his rights under 42 U.S.C § 1983. As no motion for summary judgment was made with respect to this claim, it must go to trial. The parties should be ready for trial beginning September 23, 2024.

The Clerk of Court is respectfully directed to close the open motion at Docket Number 58.

This constitutes the decision and order of the Court. It is a written opinion.

Dated: May 28, 2024

_____
U.S.D.J.

BY ECF TO ALL COUNSEL